The next case is number 13-1074, Versata Software, Inc. v. Internet Brands, Inc. Mr. Adams. Thank you, Your Honor. May it please the Court, at the end of trial in this case, the jury found that Versata had breached two contracts, a 1997 confidentiality agreement and a 1998 master services agreement, or MSA. They breached those contracts by violating the confidentiality provisions of those agreements, which resulted in a misappropriation of trade secrets. The district court, which was Judge Bryson, properly noted that because of the misappropriation, this caused harm to my client, Autodata. The jury awarded $2 million because of that misappropriation, and they also awarded a dollar in nominal damages because of the breaches of contract. The jury also ruled in Autodata's favor. What you asked for from the jury was merely the nominal damages, is that right? Correct, with regard to the breach of contract. Wasn't there an injunction in play at some point? After trial, we sought an injunction. Judge Bryson denied that, saying that because of the passage of time, he didn't believe there was a continuing injury that was occurring to Autodata. At the trial, the jury also ruled in Autodata's favor as to all other claims that both parties were asserting. Prior to trial, there was also a breach of contract issue that was brought by Versata, where Versata was alleging that Autodata breached that same 1997 confidentiality agreement. In that situation, Judge Bryson ruled in our favor on a motion for summary judgment and found that Autodata did not breach that agreement. Let me just cut to the chase. Is your view that you're entitled to attorney's fees under Texas law because the judge misconstrued Texas law? Or is there some other theory upon which you think you would be entitled? I appreciate you cutting to the chase. There's really two reasons. I guess the short answer to your question is, yes, we believe the judge misinterpreted Texas law, but we also believe that the judge missed an important point that we made in our motion for attorney's fees, which was under Texas law, it's clear that the prevailing party who successfully defends a breach of contract cause of action is entitled to attorney's fees. And that's the one example is the Robbins case. The judge did not address that in his order, the fact that we... I thought... I don't have the citation, but I remember, I guess, looking at a page in the joint appendix from your brief that was explicit in saying, we seek attorney's fees only on our own contract claim, not for winning as a defendant on the other side's contract claim. I don't believe our motion for attorney's fees said that. I know that we did explicitly say that we thought we were entitled to attorney's fees for successfully defending the 97 agreement, and that record citation is A2486. And if Your Honor would like, I could read the actual language from the brief. But the second brief... Yeah, but that's the citation I have for the point that Judge Taranto had raised, that you were saying that you were only seeking attorney's fees attributably to your own breach. Is that... I haven't looked back on it recently. What do you... The initial part of our... What did you hear of what that... Right. So that's, in fact, what I was remembering. The heading, auto data is only seeking attorney's fees attributable to or substantially connected with its breach of contract claims, and that's what the pages thereafter then go and argue. That was certainly our focus at the time that we were the prevailing party on both contracts. And we argued that we were the prevailing party because we had received at least nominal damages. But we also later on argued in the motion, and maybe we should argue it closer up front, that because we successfully defended the agreement... Can you show me where that is when you say later in the motion? Sure. It's A2486. It couldn't be later on that page because what I just read you were the last two lines on that page. Okay. I'll just read you what I'm referring to. It says, Versada also claimed breach of contract and tortious interference regarding alleged reverse engineering by auto data. That's about a third of the way down on that same page. Okay. Versada claimed... Right. So what? And then underneath that we say, under these claims, Versada asserted that because of that reverse engineering, the 97 confidentiality agreement was breached. I'm sorry. We're looking at 2486 under number three? No, just above. Oh, just above that. Okay. The key is the last line where it says, accordingly, auto data was also the prevailing party on these claims and is entitled to recover its fees and expenses accrued in defending against these claims under the 97 confidentiality agreement. Well, I haven't looked at this in a while, but why don't you follow down to D? Doesn't D in both letters say, auto data is only seeking attorney's fees attributed to a law substantially connected with its breach of contract claim? Yes. So maybe the sentence you cite creates any ambiguity, but it seems to me that ambiguity is completely answered on the same page, right? What am I missing? Well, I don't think you're missing anything. I think we were ambiguous and should have been clearer about the attorney's fees we were seeking. The focus at that time was whether or not nominal damages was sufficient to establish Okay. So why don't we turn to that issue? Okay. Okay. And on that question, the cases that are laid out by Judge Bryson and his opinion speak to the fact that the relief thought has to result in some material alteration in the legal relationship of the parties. How does $1 in nominal damages do that? Well, $1 by itself, I would say, is probably, well, it may be sufficient. The Texas law doesn't say whether a dollar is enough or not. But you agree the standard is that the actual relief would materially alter the relationship between, legal relationship between the parties. Yes. Or another way I would say it is the party would have to obtain some meaningful relief. For example, in the KB Home case, the KB Home party received zero damages, received no other relief. But that's not what I'm asking you. I mean, I read the cases as saying that the actual relief on the merits would have to materially alter the relationship between the parties. Do you agree that that's the standard? Yes. Okay. So how did the $1 in nominal damages heal? Well, the dollar by itself did not. But the dollar was significant in the fact that it established that these two contracts were breached. And because of the breach, it was the confidentiality provisions that were breached, that resulted in the trade secret misappropriation. We needed to establish the breach of the contract in order to establish trade secret misappropriation. By establishing trade secret misappropriation, we were able to obtain the $2 million damages award from the jury. We also obtained all the other relief that we asked for from the jury, although not directly related to the contract. But with regard to the contract, that directly resulted in us obtaining $2 million in attorney fees. Do these contracts persist? Arguably, yes. But they're not active. No one's really performing any services. There may be some continuing obligations with regard to confidentiality obligations. But the parties are not actively involved in the two contracts at this point. All right. Let's hear from the other side. And we'll save enough rebuttal time. Mr. Cole. Thank you, Your Honor. May it please the court, Scott Cole with McCool Smith on behalf of Versada. I'll start with the breach of contract attorney's fees issue. And I think the court put their finger correctly on the first of the issues, namely, were there additional arguments beyond the prevailing party standard that were in play that the court improperly ignored? And I believe, as the questions indicate and as the briefing below indicates as well, the making as being limited to arguments that they were the prevailing party under their own breach of contract claim. And he analyzed the claim, their claim, as such. And we don't believe. So it seems to me, though, that your friend's argument then goes on, moves on to say not just that $1 nominal damages ought to be submission under the case law. They ought to be able to glob on to the additional $2 million damage award with regard to So could you respond to that? Sure. Their argument there is that the relief they recovered under a different cause of action, misappropriation of trade secrets, ought to count as a proxy relief in effect under the breach of contract action that would make them a prevailing party. The problem with that argument is they're mixing and matching causes of action. And in particular here, the type of recovery they had was a disgorgement remedy. It was recovering the profits that we made on a contract. And that kind of relief is not available under a breach of contract claim under Texas law. So the theory, the $2 million wouldn't have been recoverable under contract anyway. And so they can't really claim that that's effectively a breach of contract damages award that materially altered the relationship of the parties, such that would make them the prevailing party. I think they can't mix and match causes of action in that way. Is that an argument that they made to the district court? Yes, Your Honor. And the district court did address that argument and basically put forth the argument that I just made, that that type of relief wasn't available and so it cannot count as a proxy that would be a hook for attorney's fees. So is the sole question that of attorney's fees under Texas law and neither side is raising the issue of the contractual provisions for fee shifting? They are raising the contractual fee. There are two separate contracts and they are raising the attorney's fee award to the prevailing party in one contract and the party in breach in the other contract. So they are making that argument. The problem with the first part of the argument was that they didn't make it below. The second problem, which is they argue that the district court incorrectly interpreted Texas law under a prevailing party standard and that in fact they contend that the correctly analyzed under Texas law, a $1 award, a nominal award, would in fact serve to make someone the prevailing party even though it's undisputed that under Texas law a $0 award, despite a liability win, does not make you the prevailing party. And the district court thoroughly analyzed the Texas law. Yeah, it's not a frivolous argument. I mean the district court looked at the cases and there's some ambiguity there and just reached a conclusion on the best answer, right? That's correct. There is no definitive Texas Supreme Court case on all fours, but the court did analyze the cases that were very close and also pointed to a number of appellate decisions under Texas law that came out squarely in our favor on the question of whether a nominal award sort of puts you in a different position than someone with a liability win but a $0 damages award. And we don't believe there's anything that the district court did wrong in that analysis. We think he got it right and we don't believe auto data has made any substantive argument that the district court's legal analysis under the case law was incorrect. Unless there are more questions on attorneys fees, I'll move to the first of our appeal arguments, namely that the district court erred in denying Jamal on the trade secret misappropriation damages theory. This question focuses on what does someone have to do under a trade secret misappropriation to recover the profits from the party that misappropriated trade secrets. And the key case is the NGE case. It's a Fifth Circuit case that makes clear in our view that a plaintiff must distinguish revenue that is derived from the misappropriation of trade secrets from revenue or profit that the defendant may have gotten from other sources. And I think that analysis is a familiar one in the patent context where we look to decide what is the value of a given piece of functionality within a broader suite of products. And I think the patent law has addressed this issue repeatedly and Texas courts actually do look to patent law for guidance in deciding trade secret damages. The university computing case from the Fifth Circuit in the 70s actually makes that point. Are you telling us that the jury instructions were incorrect as a matter of law? We don't believe the jury instructions were incorrect. What we are saying though is that there was no substantial evidence that the entirety, 100% of the profits that Versada made on three different contracts were entirely attributable to the two very specific trade secrets that auto data alleged were used as part of the products and services sold under those contracts. Wasn't there evidence that they simply would not have gotten the contracts had these particular trade secrets not been embodied in the software? No, Your Honor. As a matter of fact, these contracts were both to Toyota entities. There was absolutely no evidence presented at all about what drove the decision by Toyota to make these purchases, what was important to Toyota in making the decision to purchase these contracts. There was no discovery taken from Toyota and no evidence presented even from the Versada side as to how the sales process went, what was or was not important. And not only that, of the two trade secrets, one of them, the compare, the ACE compare algorithm, is clearly embodied in one particular product that was sold as part of the Toyota package, the FC vehicle compare product. That product of the dozen or so software products that were licensed was the one and only product that was never actually delivered to Toyota. It was promised to Toyota. What am I missing? Maybe I just want to understand what you're saying because I do have some citations to the record that are included in the yellow brief at 23 where your friend is telling us that there was testimony with regard to the demand and that this formed the basis for the demand. The testimony, if you look at the testimony closely, what it is is their testimony saying that back in the 90s when these contracts were signed, compare and configuration as general umbrella technology categories were very important in the marketplace in general. It was a very generalized testimony and not only was it generalized to the market in general rather than the specific purchase here. It was generalized in that it was addressing the umbrella technology categories, compare and configure, into which these two specific trade secrets fit. Just to give you an example, the comparison technology of the umbrella, the specific trade secret is a specific set of steps that you can do in order to configure cars to compare them to one another. It's a specific algorithm, a set of steps. They actually boiled it down to three steps. The other trade secret is a database schematic. It basically is a way of organizing automotive data. The thing about it that they contended was a trade secret was the fact that it was organized at the vehicle trim level rather than the vehicle model level. The vehicle model is a sort of higher level of abstraction.  Those were the secrets. They fit within those categories, but any testimony that the categories were important does not do anything to establish the importance of the trade secrets themselves, even if they had had testimony about this particular contractual relationship and what was important there. The way you just said that can't quite be right. It certainly does something to establish it. If, for example, in the time within which Toyota wanted such a product, there was no meaningful alternative or ability to develop it independently so that to provide the much desired functionality, the only way they were going to be able to do it was to use the trade secret, that would provide the connection. Hypothetically, that's correct, but there is no evidence that without these trade secrets you could not configure, compare automobiles. That is not in the record. Did you put on any evidence that there were alternatives out there available or developable that would meet this, what you described as a general demand in the industry at the time? As to configuration, there is evidence in the record that Versada had a pre-existing configuration product that predated any exposure to Autodata's trade secret. That is in the record. In terms of the database schematic, there are clearly other ways to organize it. The testimony from Autodata on the significance of their particular trade secret was it's very simple. What it does is it makes it more efficient to translate raw data from an automotive manufacturer and put it in a form that is configurable. In other words, it makes that process easier. That's the claimed benefit. That's a far cry from saying if you don't do it this way, you cannot configure and compare automobiles. There is no proof of that in the record. Now, I think there's been some confusion in the briefing here on whether or not the entire market value rule from patent law is applicable here. Let me try to see if I can summarize where we have been. We have been consistent in saying that there is no law or case under trade secret law that says you don't have to apportion and limit your claim to revenue or profits that's attributable to the trade secret if you can show that the trade secrets were sufficiently important in an overall product. That's sort of the entire market value rule gives an exception in patent law to the normal requirement that you limit yourself to the value of your specific patented functionality. There is no law that says that kind of exception that allows you to grab more applies to trade secret law. Down below, they made several arguments and cited this court's entire market value rule case law for the proposition that their trade secrets were so important that it was okay for them to claim 100% of our profits on these contracts. On the appeal briefing here, they then said, no, we're not in fact making an argument that the entire market value rule applies and if that's true, we don't think there is any basis whatsoever for them to claim 100% of our profits because clearly there was more than the two trade secrets that were delivered to Toyota. Clearly, 100% of our profits cannot be fairly attributed just to these trade secrets. You say clearly there was more. You provided evidence as to this breakdown? Yes, Your Honor. What was your number? Our number in terms of a breakdown? No, they got $2 million because they got 100% of the profits. What percent of the profits was your number? We did not provide an alternative damage model, if you will, but we believe analogously under RescueNet that that is not required. It's not required to rebut a damage model that you believe to be fatally flawed, which is what our position has been. Well, if you're coming up and the jury is hearing strong testimony from the other side and your position is they're grabbing too much more than what they're worth, in order to appreciate that, one would expect that you would identify where the too much is and put some sort of figure on it. So you did not do that here. We did not put a figure on it. We certainly extensively explored on cross-examination why their claim was far too much. In other words, for example, we made the point to the jury that if the product that most directly embodied the trade secrets was not even delivered, even though a dozen other software products and bunches of services were delivered, clearly that is not a high percentage of the value of this contract. We made that argument on cross-examination. We don't believe we were required to present our own number saying, well, in fact, we think it's one percent or half a percent or whatever. We believe we… I wasn't suggesting that you were necessarily as a matter of law required to do it. I was just maybe opining that it might have been clearer to the jury and therefore to us as well as to what was really going on here in terms of the actual facts. And I think in fairness to the jury, I mean, Autodata's counsel argued in closing argument that the law is that if we misappropriated their trade secrets, we have to hand over all of our profit in the contract. Now, that's an incorrect statement of the law, but certainly from the jury's standpoint, it's easy to see how they could believe that that may have been misled or under a misimpression. But I assume you argued otherwise to the jury? I apologize, Your Honor. I can't remember at what stage whether we had a rebuttal after that point. Certainly, we did if we had an opportunity. I just can't remember at the moment whether their argument was at the tail end or whether we had a chance to… And I assume, going back to Judge Newman's question about jury instructions, I assume there was a… There clearly was a jury instruction that you don't challenge because you're not challenging jury instructions that I assume had something about causation in it, that it's about profits attributable to or caused by or resulting from or something. Yes, Your Honor. Again, we're not challenging the jury instructions. We're simply challenging the sufficiency of the evidence to support a claim that does not, in fact, isolate the value of the trade secrets within this whole contract bundle and that, therefore, there is no substantial evidence to support 100% of our profits being handed over to them. I see my red light is on. But just in closing up, we think the MGE case makes it clear that a reversal of the district court's JMAL denial and a rendering of zero damages is an appropriate remedy in this case. Okay. Thank you. Thank you, Mr. Cope. Mr. Adams. Before I address the trade secret damages, I just wanted to clarify a couple points related to the attorney's fees. I think I may have misspoke or not articulated what I intended to articulate, but, Your Honor, Judge Prost, you had asked if the Texas law was that in order to be a prevailing party, there had to be a, I can't remember the words used, but significant change in the party's positions. I certainly think that is a factor in determining whether someone's a prevailing party. But there is other case law, for example, the Robbins case, which we cite in our brief, which basically says whether a party is a prevailing party is based on success on the merits, not the award or denial of damages. And clearly in this case, we were successful on the merits, and whether or not we just received a nominal damages award of a dollar doesn't make a difference under that case law. Also with regard to whether we were only seeking attorney's fees for Versada's breaches of the contract, I didn't have the appendix with me when we were talking about it earlier, but I've now looked at it. It does say auto data is only seeking... One more time, what are you reading from? Starting with A2486, which is the heading I think Your Honor referred to, which says auto data is only seeking attorney's fees attributed... We're on the page. It's very, very bottom. Yes, okay. We're only seeking attorney's fees attributed to or substantially connected with its breach of contract claims. And if you look earlier... What if you read that with the emphasis on the word it's? That's how I read it. That is clearly how Judge Rice had read it. Right, but the substantially connected I don't think you can ignore. And if you look at the appendix A2484, we specifically say that our defense against Versada's claims substantially overlapped with Versada's breach of contracts. So I think it's clear in our motion that we were saying that we were entitled to attorney's fees for both Versada's breach of the contracts as well as our successful defense and that those claims were substantially overlapped. I'd like to turn now to the trade secret damages issue. I believe what Versada's doing is actually trying to change the law under MGE. There's not a lot of precedent on what the burden of proof is for trade secret damages, but MGE basically set forth the standard being that a plaintiff cannot recover damages without evidence to show the actual profits made by the defendant from the source of revenue gained through misappropriation of trade secrets. I believe what Versada's trying to do is interpret the law as imposing a requirement that Autodata had to show that the entire value of the Versada Toyota contracts was attributable to the trade secrets in issue. And that's not what MGE requires. I believe Versada's also trying to impose the requirement that we apportion the value of the trade secrets. Again, that's not part of the MGE analysis. Under MGE, the issue there was that the damages expert had only looked at the company's entire revenue and in addition didn't figure out what source of that revenue related to the misappropriation and then further did not figure out what the profits were from that source. Here, unlike MGE, our damages expert did identify the source of the relevant revenue, which was the Toyota contracts. Versada clearly had other revenue from other sources and then our expert, based on the evidence and his expertise, figured out what profits from those Toyota contracts were attributable to the trade secret misappropriation. And the district court... I'm sorry, was the answer all? Yes, all. Yeah, okay. All 2 million. And the district court notes that the jury could have reasonably found that all those damages, all 2 million, were supported by substantial evidence. The district court and its order denying the JMO sites to record testimony and documents. We, in our brief, also cite to several pieces of evidence and testimony that we believe support the experts' damages theory. So we believe that this situation is a far cry from the evidence that was in the MGE case and that we had clearly shown that the jury was entitled to conclude that the trade secrets were the basis for the core features of the products offered to Toyota and that Versada's profits on those contracts was entirely attributable to the trade secrets. And so we think our damages expert did have sufficient evidence to find that $2 million in profits was the appropriate damages number.  Any more questions? Thank you. Thank you both. The case is taken under submission.